Charles L. SIKES and Arnold T. Sikes, Plaintiff-Appellees Cross-Appellants,

v.

McGRAW–EDISON COMPANY, Defendant-Appellant Cross-Appellee.

No. 80–2089.

United States Court of Appeals, Fifth Circuit.

Jan. 14, 1982.

Rehearing Denied March 25, 1982, See 671 F.2d 150.

732

Haight, Hofeldt, Davis & Jambor, Edward A. Haight, Chicago, Ill., Cotton, Bledsoe, Tighe & Dawson, Charles Tighe, Midland, Tex., for McGraw-Edison Co.

W. B. Browder, Jr., Midland, Tex., for Charles and Arnold Sikes.

Before GEE and RUBIN, Circuit Judges, and SPEARS *, District Judge.

GEE, Circuit Judge:

This diversity case presents issues controlled by the Texas law of trade secrets. Plaintiff-Appellee Charles L. Sikes (Sikes) recovered a substantial judgment below against Defendant-Appellant McGraw-Edison Company (McGraw-Edison), which ap-

peals asserting errors in the court's instructions to the jury, in evidentiary rulings, and excessiveness of damages. Mr. Sikes has lodged a cross-appeal which, however, he states in brief that he wishes to waive in the event the judgment below is affirmed. Since we do affirm, it is waived unless the Supreme Court decides otherwise.

In late 1974, Charles L. Sikes, an electrical engineer and a "tinkerer," was inspired by observation of the powerful "Weed Eater" mowing tool then being successfully marketed to experiment with developing a light-weight trimmer, usable in tight places where bulkier equipment would not fit. Working with a small trimmer already on the market, he modified it by replacing its metal blade with a nylon monofilament line, inserted in a hole drilled at the end of the power transmission wand and held in place by an enlarged end and the operation of centrifugal force.

In early 1976, Mr. Sikes demonstrated his device successfully to McGraw-Edison and provided it with written material and engineering drawings. Before he did so, the parties entered into a letter agreement providing, in pertinent part:

This confidential disclosure agreement shall remain in full force and effect between myself and McGraw-Edison Company for a period of two (2) years from date of disclosure, unless such submitted information can be shown by McGraw-Edison Company to have been in its possession, or of public knowledge, or to have been in the public domain prior to such submission . . . .

At this demonstration, which commenced indoors and later proceeded to the plant yard, the McGraw-Edison employees seemed highly enthusiastic about Mr. Sikes' device.[1] As the demonstration progressed, more and more highly placed executives were summoned to watch. Their comments suggested to Mr. Sikes that they had never seen quite such a device before; none gave any indication that any similar one was

* District Judge of the Western District of Texas, sitting by designation.

1. Here and throughout our opinion, we view the evidence in the light most favorable to the jury verdict, as settled law requires.

known to them. Sikes was twice asked how much he wanted for the invention. His response of $50,000.00 cash and a 50 cents per unit royalty produced the rejoinder that the cash asked was a little too high but the royalty seemed about right. Matters concluded with Mr. Sikes' leaving his model and papers with McGraw-Edison for their further study.

About two weeks later, McGraw-Edison invited Mr. Sikes to return to Missouri, where the first demonstration had been held, for further negotiations. He went, accompanied by his brother. At this session, the McGraw-Edison personnel took a somewhat different line.

Though at the earlier conference they had indicated keen interest and had confided both that a somewhat comparable device which they had under development would not be ready for two years and that it was vital that they bring a trimmer out in time for the August 1976 home product show, at this time they advised the Sikes that their own product was already developed. He was told that even so they maintained an interest in his device because their's would cost a few cents more to manufacture. Sikes rejected the offer of this amount— "about 8 cents"—per unit as a royalty. Negotiations faltered and, later, came to a close.

McGraw-Edison met the August deadline with its "Graswhip," a device remarkably similar to that of Mr. Sikes and one which has proved a considerable success. This suit followed in due course, asserting that McGraw-Edison had improperly availed itself of Mr. Sikes' device in bringing out the Graswhip. The jury awarded $900,000 damages. In several points of error, McGraw-Edison urges that it did not use Mr. Sikes' ideas, that they were already known to it, that they were already public knowledge at the time of their disclosure to McGraw-Edison by Sikes, and that the court's instructions to the jury on damages and on the Texas law relating to trade secrets were wrong. It is convenient to take up the last of these points first.

2. Restatement, Torts § 757 (1939).

### Texas Trade-Secret Law

McGraw-Edison concedes that the definition of trade secrets given the jury was correct Texas law. We shall have occasion to refer to it later:

You are instructed that a trade secret may be a device or process which is patentable, but it need not be that. It may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement that a good mechanic can make. Matters of general knowledge in an industry cannot be taken by one person as a trade secret, nor as a simple and obvious change in an existing device or process entitled to protection as a trade secret. There must be some improvement which gives the one using the device or process an opportunity to obtain an advantage over competitors who do not know of the device or process or uses.

This definition is taken in part from that of the original Restatement,[2] one which has been quoted with approval by the Texas courts. *K & G Oil Tool & Service Co. v. G & G Fishing Tool Serv.*, 158 Tex. 594, 314 S.W.2d 782, 789 (1958); *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, 776 (1958). There can be little doubt that it represents good Texas law.

McGraw-Edison argues, however, that the definition was improperly given the jury because Mr. Sikes' device was not a trade secret at all, but something different: a "new product idea." In doing so it finds comfort in a single authority, *Richter v. Westab, Inc.*, 529 F.2d 896 (6th Cir. 1976), which does indeed draw this distinction. For several reasons, however, we conclude that this reliance on *Westab* is misplaced.

First, the "secret" involved in *Westab* was that a school supply firm could improve sales of notebook covers and binders by employing on them fashion designs and fabrics matching those being currently advertised in young women's fashion magazines. This is a mere abstract idea, a marketing

concept, and is so characterized by the *Westab* court. *Westab*, at 900–902. As such, it is a far cry from Mr. Sikes' functioning grass trimmer, and we doubt that principles developed by the *Westab* court to deal with it have application here.

Second, McGraw-Edison argues that here, as in *Westab*, no competitive advantage was provided by the Sikes device because it could be copied as soon as it was marketed. This argument fails for a number of reasons. The first is a factual one: the evidence here is such as amply to support a conclusion by the jury that the Sikes device gave McGraw-Edison an opportunity to steal a march on competitors unfamiliar with it, as indeed McGraw-Edison did. In a nutshell, it shows—viewed most favorably to the verdict—that McGraw-Edison had been struggling to develop such a product, that it believed itself two years away from success at the time of Mr. Sikes' disclosures, that the first working drawings of the Graswhip were dated after that disclosure, that the Graswhip was developed from the Sikes device and put on the market within six to eight months from its disclosure, and that the Graswhip was a success. The second is a legal one: Texas law does not seem much impressed by the circumstance that a device, once marketed, can be readily copied. In *K & G Oil Tool & Service Co., supra*, for example, an award of damages was affirmed against one who disassembled a tool in violation of an agreement not to do so and copied it, even though the jury found that the internal construction of the tool could be sufficiently determined for copying without disassembly. That the offender *could* have obtained the information without violating its agreement did not signify where in fact it *did* obtain it by doing so. By a parity of reasoning, that a competitor could have copied the Sikes device once it was marketed—which is to say little more than that it was not patented or patentable—does not mean that having it available did not confer at least a temporary competitive advantage on McGraw-Edison.

In sum, we conclude that McGraw-Edison's arguments based on the *Westab* distinction must fail, essentially because the Sikes device is of such a kind as to fall within the Texas concept of trade secret. We next address briefly the contention that McGraw-Edison did not use the Sikes device in developing its Graswhip.

*Did McGraw-Edison Use the Sikes Device?*

■ Little need be said in response to this contention, essentially one that record evidence does not support the jury verdict. Pointing to a different mode of attaching the nylon flail to the end of the Graswhip's power wand, McGraw-Edison argues that this is dispositive of the matter. The Sikes device employed a short length of monofilament having a bulb at one end, threaded through a transverse hole across the wand's full diameter and held in place by centrifugal force. The Graswhip's nylon flail replaced the bulb with an eyelet threaded over an axial peg at the end of the wand, with the length of line passing out through a hole in one side of the wand. We are not convinced.

We have briefly summarized above the evidence that, viewed most favorably to the verdict, amply supports it. Much of it came from employees or former employees of McGraw-Edison. To quote the testimony of one witness only, a former McGraw-Edison Vice-President in charge of tool-division marketing:

Q But, Mr. Sullivan, couldn't you have just taken a Weed Eater and take off the guard or take off its spool for putting a cord in and out and just any man in your shop have come up with this thing in two days?

A I suppose the answer to that is yes, they could have, but the other answer is no, they didn't. They weren't able to. There was no, we had never thought of doing that kind of thing.

Q Had you then been working on that trying to get a lawn trimmer?

A Well, some time in 1975 Mr. Spencer directed that the products policy committee and the engineering department and the manufacturing to cease talking about a nylon line grass trimmer. He

didn't want to hear about it any more, for whatever reasons he had. We were unsuccessful, he didn't think we were going to be able to get around the patents that Weed Eater had and he didn't want to hear about it any more .... And I think we all got the message, and we were not, we had no time or talents being spent on a nylon line grass trimmer at the time that Mr. Sikes visited our office.

. . . . .

Q ... I want to ask you, did McGraw-Edison use this [Sikes'] tool for some purpose in its development of its own tool?

A I would say that this tool was the start of McGraw-Edison's development of their Graswhip, that this was the tool that we used out in the field for testing, and we took our motors and our envelopes and tried to develop the tool from this product, from this one here.

Any contention that on such evidence the jury could not properly find that McGraw-Edison used the Sikes device in developing its Graswhip is meritless.

### Did McGraw-Edison Violate Its Non-Disclosure Agreement with Mr. Sikes?

A more serious group of contentions by McGraw-Edison concerns whether the express agreement that it had with Mr. Sikes was breached by its actions in appropriating his device. Since the parties entered into such an express agreement governing their relationship resulting from the disclosure, questions of implied contract do not arise.

Their agreement, as pertinent here, provided that McGraw-Edison would not, for two years after the disclosure by Mr. Sikes, use or disclose the information submitted by him "unless such submitted information can be shown by McGraw-Edison Company to have been in its possession, or of public knowledge, or to have been in the public domain prior to such submission ...." The court charged the jury in exact conformity with this language, directing it to find for McGraw-Edison if any of the above circumstances was established by a preponderance of the evidence. Since it did not, the question becomes whether its verdict is clearly erroneous on the basis of the evidence.[3]

It is clear that much of the information transmitted to McGraw-Edison by Mr. Sikes was of a public nature. The basic machine, for example, was a commercial trimmer, available on the open market. Many features of the machine, even as modified, were disclosed by prior patents or otherwise generally known. And McGraw-Edison itself had received disclosure earlier from a Mr. Schubert of a modification of the same commercial trimmer to incorporate a nylon flail, though one of a somewhat different size and considerably greater length than that of the Sikes device—6 to 9 inches, as opposed to 2.8 on the Sikes device and 2.9 on the Graswhip.[4] The Schubert disclosure was one of mere paper plans, however, and no working device was furnished by him. Hence his disclosure could not and did not show, as Sikes' did, that the exact device disclosed would function and function effectively. Sikes, moreover, disclosed to McGraw-Edison that a slightly larger motor would produce better results than did that on his device, and the Graswhip duly incorporated one.

We think that under the concededly correct definition of trade secret under Texas law given the jury by the trial court, this

**3.** Mr. Sikes argues strenuously that on the authority of *K & G Oil Tool & Service Co.*, cited in text, it matters not that McGraw-Edison could have obtained the information elsewhere if in fact it got it from him. This argument overlooks the terms of his express contract, which appear to rule out such questions of causation and, strictly construed, absolve McGraw-Edison from any duty of non-use if it in fact possessed the disclosed information already, or

if it was in fact public knowledge, etc. Since we conclude that the jury could properly have found that it was none of these things, we need not decide whether this contention has any place in such a case as this.

**4.** There was expert testimony that these differences, though to laymen such as we they do not seem large, were significant because of the sensitivity of small motors to loads imposed.

evidence permitted it properly to find that the Sikes device was such an "improvement which gives the one using the device or process an opportunity to obtain an advantage over competitors who do not know of . . ." it as Texas law protects. More to the present point, we think it could also properly have concluded that the Sikes device, actual and functioning, went significantly beyond any "information" in McGraw-Edison's possession, of public knowledge, or in the public domain at the time of its submission. Indeed the evidence indicates and the jury could properly have found that the device was the first successful one of its kind, a lightweight grass-cutting flail that did not infringe the Weed Eater patents.[5]

In these circumstances, we find our case analogous to *Water Services, Inc. v. Tesco Chemicals*, 410 F.2d 163, 173 (5th Cir. 1969), where, speaking of the first successful, fully automated system for purifying water for industrial use, we said:

> The district court found that the components were not developed by Farris, were available on the open market, and were ascertainable. It is clear that the *theory* of the Treat-A-Matic was not new to the industry. The court also found that the design was apparent from inspection, and that the system had been sold and advertised without restriction. These findings are supported by the evidence. But these findings are not conclusive. The trade secret here was the application of known techniques and the assembly of available components to create the first successful system in the industry. In the trial judge's words, "no components had been brought together into one lightweight automated system until the perfection of the Treat-A-Matic." As the Second Circuit stated in *Imperial Chemicals, Ltd. v. National Distillers & Chemical Corp.*, 2 Cir. 1965, 342 F.2d 737, 742, "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectible secret." This characterization describes the TREAT-A-MATIC. The composition was unique and conferred a substantial competitive advantage on Farris. Indeed, the company enjoyed unparalleled financial success during the four years that competitors were unsuccessfully trying to duplicate the TREAT-A-MATIC."

*Tesco*, to be sure, concerns Georgia law, but Georgia, like Texas, recognizes the Restatement definition of trade secret; and we think our language there apposite here. The jury could properly have found, as it did, that McGraw-Edison breached its agreement with Mr. Sikes.

### Amount of Damages and the Damages Instruction

■ The court's charge on damages instructed the jury to compensate Mr. Sikes in that amount shown by a preponderance of the evidence to represent his "actual damages, if any, caused by the Defendant's infringement and the amount of money by which the Defendant was unjustly enriched, if any, as a consequence of Defendant's infringement." McGraw-Edison objects to the charge on several distinct grounds and contends as well that the $900,000 award is "monstrous" and excessive.

First, it complains that the charge authorizes a double recovery: "both the damages to Sikes and the McGraw-Edison profits." The contention is not wholly without merit, for the charge—to the eye of a lawyer—is perhaps technically subject to such a construction. For reasons which we note below in our discussion of the amount awarded, however, we think it clear that the jury was not misled. Instead, it seems apparent that it followed a reasonable, layman's view

---

5. This is not to say that were we presented with the issue we would make such an initial finding, only that the jury could properly have done so. Nor is it to say that merely presenting a working model of what another already has on paper, without significant change, entitles one to protection; here there was evidence that Sikes' changes were significant improvements over anything then known.

of the instruction: that it should award to Mr. Sikes compensation for any actual losses suffered by him as a result of McGraw-Edison's breach of faith plus a reasonable amount as compensation for the unauthorized use of his device. So viewed and applied, the instruction is not improperly prejudicial to McGraw-Edison.

■ Next complaint is made of the court's references to infringement and to unjust enrichment, as inappropriate to a breach of contract case. We have held otherwise as to trade secret matters, however, in *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535–7 (5th Cir. 1974). And although *University Computing* is a Georgia diversity case, neither the course of its reasoning nor the authorities cited are limited to Georgia law.

■ Next, McGraw-Edison complains that the instruction permits the jury to appropriate to Sikes all of its profits from the Graswhip, not merely those attributable to the use of his device. We do not so read the instruction's language: "the amount of money by which the Defendant was unjustly enriched ... *as a consequence* of Defendant's infringement" (emphasis added).

Finally, the charge is attacked for its failure to refer to the contract's two-year limitation on disclosure. Since, according to the agreement, McGraw-Edison could properly have used the Sikes' disclosures without his consent after two years had passed, it argues that the jury should have been permitted to consider only sales of the Graswhip that occurred during that period.

■ The argument, while it possesses some plausibility, must be rejected on several grounds. In the first place, McGraw-Edison did not comply with the two-year clause that it seeks to press into service but rather breached it. Since it did so, the consequences that would have followed on its compliance cut little of a figure here. In the second, no man can say with certainty what might have happened had McGraw-

Edison complied with the clause in either of the two modes open to it: obtaining Mr. Sikes' consent to use his device by agreeing with him on a royalty of some kind or biding its time while the two years passed before appropriating it. But had it done the former, it seems exceedingly unlikely that any such per-unit royalty as the parties might have agreed upon would have been so arranged as to terminate after two years or have been payable for any term other than the life of the Graswhip's saleability. And since an award to Mr. Sikes of an amount approximating what he would have received had a reasonable royalty been paid him is an appropriate measure of damages, *University Computing Co.*, 504 F.2d at 536–8, it is also appropriate to measure its amount by reference to the most likely period for which it would have been paid had McGraw-Edison complied with its obligations under the contract. As we shall see presently, this is what the jury apparently did. We find no fault with its approach.

■ Coming, then, to the amount of the verdict, we do not find it "monstrous" or excessive at all. There was testimony that as of shortly before trial McGraw-Edison had sold 1,536,226 Graswhips. Dividing the $900,000 award by this figure produces a hypothetical royalty of 59 cents per unit. There was, as we have noted, evidence that Mr. Sikes had proposed a 50-cent per unit royalty [6] and received a reaction from McGraw-Edison that this was "about right." Expert testimony as to what a reasonable royalty would have been ranged from over a dollar per unit to ten cents. The jury verdict is well within that range.

AFFIRMED.

---

**6.** Plus a substantial cash payment, $50,000, characterized by McGraw-Edison as a little too high.