**PICKER INTERNATIONAL, INC.**

v.

**Carl BLANTON.**

**No. CA3–89–0701–F.**

United States District Court,
N.D. Texas,
Dallas Division.

July 25, 1990.

Kenneth R. Adamo, Jones, Day, Reavis & Pogue, Dallas, Tex., Stephen J. Squeri, Mark A. Belasic, Jones, Day, Reavis & Pogue, Cleveland, Ohio, (Andrew R. Morse, Picker Intern., Inc., Highland Heights, Ohio, of counsel), for plaintiff.

Alan N. Magenheim, Hirsch Glover Robinson & Sheiness, Houston, Tex. (Michael Nutter, Santa Ana, Cal., of counsel), for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION

ROBERT W. PORTER, District Judge.

CAME ON the Court this day to consider the Plaintiff's Motion For Preliminary Injunction. After review of the applicable law and careful consideration of the parties' briefs, proposed findings of fact, proposed conclusions of law, exhibits, affidavits, and transcripts of depositions, the Court is of the opinion that the Application should be GRANTED as set forth hereinbelow.

### FINDINGS OF FACT

(1) Plaintiff Picker International, Inc. ("Picker") is a New York corporation with its principal place of business in Highland Heights, Ohio.

(2) Defendant Carl Blanton ("Blanton") is a resident of the state of Texas. Blanton began employment with Picker on May 18, 1987 as a field service engineer responsible for the maintenance, service and repair of Picker MRI systems.

(3) Picker is engaged in the manufacture, selling and servicing of sophisticated, high technology medical diagnostic equipment, including magnetic resonance imaging systems ("MRI systems").

(4) Servicing the MRI systems which it manufactures is a significant part of Picker's business, and MRI systems require frequent and consistent service in order to function satisfactorily.

(5) Picker has spent millions of dollars and man-years of research to accumulate knowledge regarding MRI system service techniques. This research has led to the production of proprietary aids and documentary materials which allow for more efficient troubleshooting and maintenance of its MRI systems.

(6) Picker MRI service engineers are provided with, and instructed in the use of, block diagrams of the Picker MRI systems which show in detail the interrelationship between the various subsystems of the Picker MRI systems.

(7) Picker has developed confidential and proprietary documentary materials for use in installing the 3M laser imager with these Picker systems, which materials include specialized calibration and dipswitch settings for the 3M laser imager.

(8) The information provided by Picker pertaining to the techniques and procedures in servicing Picker MRI systems is maintained by Picker as confidential, proprietary and trade secret information. Documents, clearly marked as the property of Picker, are labeled as Picker proprietary information which may not be copied or disclosed to anyone.

(9) Picker has established its own school for the training of its MRI field service engineers. Students are provided with, and trained to use, Picker's confidential and proprietary manuals, schematics, diagrams, and operational and diagnostic software.

(10) Picker MRI service engineers are instructed during their training to maintain as confidential and proprietary the information provided to them in their training; service manuals, diagrams, schematics and other compilations are specifically designated as confidential and proprietary; and service engineers are required, as a condition of their employment and their Picker training, to execute a Service Engineer Confidentiality Agreement ("Confidentiality Agreement") with respect to the information learned by them as Picker MRI service engineers.

(11) On the day Blanton began his employment with Picker, 5/18/87, and in consideration of his employment and the training he was to receive from Picker, Blanton executed a Confidentiality Agreement. Said Agreement was executed at Picker's office in Irving, Texas.

(12) Blanton read the Confidentiality Agreement before he executed it, and Blanton received a copy of the Confidentiality Agreement at the time he executed it.

(13) *Non-use and non-disclosure:* In the Confidentiality Agreement, Blanton agreed not to disclose or use confidential information learned by him while employed by Picker. The Confidentiality Agreement provides in pertinent part as follows:

Unless I first secure PICKER INTERNATIONAL'S written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION of which I become informed during my employment, whether or not developed by me.

\* \* \* \* \* \*

DEFINITIONS:

\* \* \* \* \* \*

*CONFIDENTIAL INFORMATION* means information disclosed to me or known by me as a result of my employment by PICKER INTERNATIONAL, not generally known to the trade or industry in which PICKER INTERNATIONAL is engaged, about PICKER INTERNATIONAL products, processes, machines and services, including but not limited to research, development, merchandising, selling and servicing, and corresponding information about the products, processes, machines, and services of PICKER INTERNATIONAL'S affiliates, acquired by me during my employment by PICKER INTERNATIONAL. The above includes any training, training materials, or any other information provided by PICKER INTERNATIONAL in relation to the installation, maintenance or repair of products manufactured, sold, or distributed by PICKER INTERNATIONAL.

Blanton Dep. Ex. 4.

(14) *Return of materials:* Blanton also agreed in his Confidentiality Agreement to return all documents relating to Picker upon the termination of his employment with Picker as follows:

Upon termination of my employment with PICKER INTERNATIONAL, prior to or upon my retirement, I shall turn over to a designated individual employed by PICKER INTERNATIONAL all property then in my possession or custody and belonging to PICKER INTERNATIONAL. I shall not retain any copies or reproductions of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents

relating in any way to the affairs of its affiliated companies and which are entrusted to me at any time during my employment with PICKER INTERNATIONAL.

Blanton Dep. Ex. 4.

(15) *Non-competition:* The Confidentiality Agreement executed by Blanton included the following non-competition provision:

I acknowledge that by virtue of my employment I will acquire information concerning PICKER INTERNATIONAL's operations, suppliers and customers, and that such information constitutes valuable and confidential information. I agree that for a period of one (1) year from the date of termination of my employment with PICKER INTERNATIONAL, I shall not directly or indirectly service any PICKER INTERNATIONAL equipment that I did in fact service at any location to which I was assigned during my employment with PICKER INTERNATIONAL.

Blanton Dep. Ex. 4.

(16) Because Blanton did not enter into confidentiality agreements with his prior and subsequent employers (*i.e.*, Diasonics and ETEK, respectively), the fact that Picker insisted upon such an agreement should have heightened Blanton's awareness of his obligation to maintain Picker's technology as confidential.

(17) On his first day of employment (5/18/87), and in consideration of his employment and the training he was to receive from Picker, Blanton executed a document known as the Employee Invention and Confidential Agreement ("EICA").

(18) *Non-use and non-disclosure:* The EICA provided in part as follows:

I will not, without Picker's written consent, disclose or use at any time, either during or after my employment, any secret or confidential information relating to Picker's business unless required by the discharge of my duties to Picker.

Blanton Dep. Ex. 5.

(19) The EICA defines "confidential information" as follows:

Your position at Picker will bring you into contact with technical or business problems of significant importance to Picker. To enable you to contribute to the solution of these problems, you may be entrusted with confidential information which, legally and ethically, is Picker's property and should be respected as such. . . .

Defined broadly, confidential information is any information which gives Picker an advantage over its competitor. It may often be difficult to distinguish between Picker confidential information (which is Picker's exclusive property) and the information which is part of the general skill and experience acquired in the practice of any occupation (which you are free to use anywhere). In case of doubt, you are urged to discuss the matter with your immediate supervisor who will arrange for you to discuss it with an appropriate officer.

*Id.*

(20) Paragraph 4 of the EICA provided as follows:

Upon termination of my employment I will promptly deliver to Picker all price lists, customer lists, plans, drawings, blueprints, manuals, letters, notes, notebooks, reports and copies thereof relating to Picker's business as well as any other property entrusted to me by Picker.

*Id.*

(21) Picker provides its field service engineers with, and requires them to follow, a comprehensive planned maintenance manual for its MRI systems. While at Diasonics, Blanton did not follow a planned maintenance schedule, and instead devised his own procedures.

(22) Blanton, like all Picker field service engineers, was instructed by Picker to maintain Picker's diagnostic software as confidential. Diasonics did not require that Blanton keep its own diagnostic software confidential.

(23) Diasonics MRI systems use DEC computers, while Picker MRI systems use Perkin Elmer computers.

(24) Diasonics MRI systems do not utilize a laser imager, whereas those of Picker do.

(25) Diasonics MRI systems use a different model of gradient amplifier than that used in Picker's model HP MRI system.

(26) The Diasonic MRI system uses a significantly different slice selection technique than do the Picker MRI systems. Diasonics does not alter the radio-frequency when selecting a certain "slice" or section of the body being scanned. Picker's, however, alters the radio-frequency transmitted for each slice during the scan. This difference has a significant impact on the design and architecture of the radio-frequency subsystem and related troubleshooting.

(27) Upon commencing his employment with Picker, Blanton was enrolled in a ten week training course for Picker MRI service engineers and was taught the special diagnostic methods and servicing techniques used on Picker MRI systems, all of which consisted of confidential and proprietary information belonging to Picker. The special diagnostic methods and servicing techniques which were taught to Blanton included the following:

(a) the specific calibration techniques to be used on a Picker MRI RF subsystem. Blanton learned the calibration settings for the Picker MRI receiver and transmitter, as well as the use of the specialized equipment and Picker software in the adjustment of radio-frequency levels.

(b) Picker's malfunction isolation techniques, which allow the service engineer to isolate the electromagnet subsystem from a perceived problem, to isolate the gradient coils from a perceived problem, and to ensure that the RF subsystem is properly functioning.

(c) Picker's troubleshooting techniques for the gradient subsystem, which training included instruction in the use of Picker's software which controls the gradients and scanning sequencing, which software is itself confidential and proprietary trade secret information.

(d) Picker's diagnostic software increases a service engineer's capability to service Picker MRI systems and reduces the time needed to identify and remedy service problems.

(e) Picker's methods of bringing the MRI system's computer from a down condition to operating capability include the use of Picker "auto boot" sequences which are proprietary information of Picker and require knowledge of the particular responses to computer prompts incorporated in the Picker MRI system diagnostic software.

(f) Picker's "ramping" procedures, which involve bringing the cryogenic magnetic field strength to the correct operating level or reducing the magnetic field strength to a safe level for maintenance work.

(g) how to use the information contained in Picker's artifacts and ghosting compendiums.

(28) Blanton was also enrolled in Picker's one week training course in installing, using and servicing a 3M laser imager. As part of that course, Blanton was provided with confidential and proprietary information pertaining to the specialized calibration and dipswitch settings established by Picker for the 3M laser imager.

(29) While employed by Picker, Blanton serviced Picker MRI systems located at:
• Southeast Texas Regional Medical Center (f/k/a Medical Center Hospital), Conroe, Texas;
• Houston Northwest Hospital;
• MR Imaging, Houston, Texas; and
• a Scientific Imaging mobile MRI unit located at San Antonio Imaging Center, San Antonio, Texas.

(30) While employed by Picker, Blanton serviced the 3M laser imagers used with Picker MRI systems located at:
• Houston Northwest Hospital, and
• Southeast Texas Regional Medical Center (f/k/a Medical Center Hospital), Conroe, Texas.

(31) While employed by Picker, Blanton serviced the 3M laser imagers used with Picker CT systems located at:

• Hillcrest Osteopathic Hospital, Oklahoma City, OK, and

• Memorial Medical Center, Corpus Christi, Texas.

(32) On approximately 10/1/88, just 3 weeks before ETEK hired Blanton, ETEK entered into its first contract to service a Picker MRI system, which was located at MR Imaging in Houston, Texas.

(33) At the time ETEK entered into its service contract with MR Imaging, no ETEK employee had prior experience in servicing a Picker MRI system.

(34) At the time Blanton was hired by ETEK, ETEK required personnel capable of instructing others in the servicing of Picker MRI systems.

(35) Blanton was referred to ETEK by Charles McDonough as a person that would be able to service the Picker MRI system at MR Imaging. Blanton met with John Keller, ETEK's chairman, on 10/11/88 and gave Keller his application for employment.

(36) On 10/17/88, ETEK communicated an offer of employment to Blanton. On that same day, Blanton placed an order with Ken's Business Supplies for the copying of one (1) set of manuals consisting of 7045 pages 8½" × 11" in size and 117 pages 11" × 17" in size. These documents were picked up by Blanton on or about 10/21/88.

(37) On some unknown date prior to 10/21/88, Blanton placed an order with Mail Boxes Etc. USA, Inc. consisting of $100.68 worth of copied documentation. These documents were also picked up by Blanton on or about 10/21/88.

(38) On 10/21/88, Blanton submitted a letter of resignation to Picker which called for Blanton's termination as of 11/4/88, in order that Blanton pursue employment with ETEK. However, because of the confidential nature of some of the documents and trade secrets to which Blanton had exposure due to his employment with Picker, and because ETEK is a competitor of Picker, Picker chose to make that same day, 10/21/88, Blanton's last day.

(39) ETEK is a Texas corporation with its principal place of business in Houston, Texas. ETEK is engaged in the business of servicing various modalities and brands of medical diagnostic equipment, including, without limitation, MRI systems, CT systems, conventional X-ray equipment and lithotripters. ETEK does not itself manufacture any product.

(40) The documents copied for Blanton by Ken's Business Supplies and Mail Boxes Etc. USA, Inc. consisted of Picker's confidential and proprietary MRI schematics and service and training manuals which Blanton did not return to Picker until 10/24/88. The documents copied are identified as one set of "Manuals", and were copied while Blanton was still an employee of Picker.

(41) ETEK reimbursed Blanton in the amount of $691.27 for the over 7,000 pages of copies of Picker MRI system manuals which Blanton had reproduced in the week prior to his beginning employment at ETEK.

(42) Blanton's explanation of this large volume of copying is neither plausible nor credible. Blanton's explanation is that sometime between 10/11/88 and 10/17/88—while still an employee of Picker—Blanton visited ETEK's offices and "volunteered" to make 25 sets of copies of ETEK's lithotripter training manuals and diagrams for an upcoming training program to be held for ETEK employees, and that such copies were those set forth in the Ken's Office Supplies work order. However, the Court would note that Blanton testified that ETEK considered these manuals as confidential and proprietary, and that Blanton could not explain why ETEK would entrust an employee of Picker—a corporate competitor with which ETEK was then already involved with in litigation, or had in the past been involved with in litigation—with information it considered to be confidential and proprietary.

Also significant to the Court's finding of the lack of credibility of Blanton's explanation is the fact that Blanton could not explain why the copying work order did not list *25* sets of copies (which would have been consistent with Blanton's explanation), but instead listed *one* set of 7045

pages and *one* set of 117 pages. Blanton also could not explain why *none* of these numbers (7045, 117, or their sum of 7162) when divided by 25 (the number of sets claimed by Blanton to have been made) yield a quotient which is a whole number.

(43) Prior to his exit interview with Picker, and subsequent to his resignation, Blanton was requested, pursuant to his obligations under his Confidentiality Agreement, to return all materials provided to him in connection with his employment by Picker.

(44) Blanton did not return Picker's 3M laser imager training course materials and Picker's Service Engineer Administration Guide upon his termination of employment with Picker. These were not returned to Picker until 3/29/89, the day of Blanton's deposition herein.

(45) Blanton has also failed to return the over 7,000 pages of Picker confidential and proprietary MRI schematics and service and training manuals which he had copied during the week of October 17–21, 1988. Blanton has not returned these copies at any time since his Picker exit interview.

(46) On 10/20/88—three days after his offer of employment from ETEK, and the day before he tendered his resignation—Blanton asked James Hrusovsky, a training specialist with the Picker Service Training Institute, to send him confidential and proprietary block diagrams pertaining to the servicing of Picker MRI systems. These were sent and received by Blanton in November, 1988, but not returned to Picker until 3/29/89, the day of Blanton's deposition herein.

(47) Blanton was hired for the purpose of MR sales and training. Appropriately enough, as of 4/7/89, his job title was "MR Sales & Training."

(48) In a letter from Picker to Blanton dated 10/28/88, Picker provided Blanton with an additional copy of his Confidentiality Agreement and advised him of his obligations under that Agreement. Blanton advised ETEK in late October 1988 that he had received the 10/28/88 letter from Picker and provided ETEK with a copy of the letter. A copy of the 10/28/88 letter, along with an attached copy of Blanton's Confidentiality Agreement, was found in Blanton's ETEK personnel file.

(49) Blanton serviced the Picker MRI system at MR Imaging, Houston, TX on 6 different occasions and spent over 40 hours at that site during his employ with Picker.

(50) As reflected in an ETEK field service report, on 2/1/89 Blanton performed RF calibration procedures on the Picker MRI located at MR Imaging which utilized Picker's "RF scaling software". Such software is part of Picker's confidential and proprietary utilities software package.

(51) Blanton has taught and may currently be teaching MRI system servicing procedures to other ETEK employees. For example, Blanton has provided technical information regarding the servicing of Picker MRI systems to ETEK MRI field service engineers Tony Izzo and Melvin Cobb.

(52) Blanton has accompanied Melvin Cobb on site at MR Imaging and performed calibration procedures on the RF software on the Picker MRI system located at that site.

(53) ETEK plans to utilize Blanton as an instructor at a training facility which would include instruction on MRI systems.

## CONCLUSIONS OF LAW [1]

### I. *Injunction Standards*

(1) The Fifth Circuit's criteria for determining that a preliminary injunction will be granted are:

(a) a substantial likelihood that plaintiff will prevail on the merits;

(b) a substantial threat that irreparable injury will result if the injunction is not granted;

(c) the threatened injury to the plaintiff outweighs any damage to defendant from issuance of an injunction; and

---

**1.** To the extent that this section includes any findings of fact not previously addressed in the section entitled "Findings of Fact", any such finding is hereby deemed incorporated within that section.

(d) granting the preliminary injunction will not disserve the public interest.

*Plains Cotton Cooperative Association v. Goodpasture Computer Service, Inc.,* 807 F.2d 1256, 1259 (5th Cir.), *cert. denied,* 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987).

▪ (2) Each of these factors must be considered to determine whether, on balance, they collectively favor granting the injunction. *Calvin Klein Cosmetics Corp. v. Lenox Laboratories,* 815 F.2d 500, 503 (8th Cir.1987). If the plaintiff fails to carry its burden on any one of these four factors, a preliminary injunction cannot be granted. *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir.1985). The court's determination as to each of the four elements are mixed questions of fact and law reviewed according to the clearly erroneous standard. *Kern River Gas Trans. Co. v. Coastal Corp.,* 899 F.2d 1458 (5th Cir.1990).

## II. *Likelihood of Success on the Merits*

### A. Claim for Misappropriation of Trade Secrets

▪ (1) During employment and after termination, an employee is obligated not to divulge his employer's trade secrets, whether or not the use or disclosure of such trade secrets are prohibited or restricted by an express contract. *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 770 (1958); *Numed, Inc. v. McNutt,* 724 S.W.2d 432, 434 (Tex.App.— Ft. Worth 1987, no writ).

(2) However, a former employee may use the general knowledge, skills and experience acquired during his prior employment to compete with a former employer and even do business with that former employer's customers, provided that such competition is fairly and legally conducted. *Numed, Inc. v. McNutt,* 724 S.W.2d 432, 434 (Tex.App.—Ft. Worth 1987, no writ).

▪ (3) A former employee's competitive use of his former employer's confidential information is unfair competition. *Id.* Thus, because Blanton was extensively trained in servicing Picker MRIs during his

employ with Picker, and because that extensive training consisted largely of confidential and proprietary Picker information, Blanton's use of such confidential information to do business with Picker's former customers and to otherwise compete with Picker in servicing Picker MRIs is unfair competition.

(4) The Texas Supreme Court has expressly adopted the Restatement rule for misappropriation of trade secrets:

> One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if ... (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him.

*Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 769 *cert. denied,* 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958) (quoting Restatement of Torts § 757 (1939)). *See also Metallurgical Industries, Inc. v. Fourtek,* 790 F.2d 1195, 1203 (5th Cir.1986) (recognizing *Huffines* adoption of Restatement as current Texas law).

(5) *Definition:* A "trade secret" is defined in Texas as follows: .

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know it.

*Hyde Corp. v. Huffines,* 314 S.W.2d at 776 (quoting Restatement of Torts § 757, Comment b (1939)). That passage has been construed to include as a trade secret information which gives the owner "an advantage over competitors who do not know it." *Hyde Corp. v. Huffines,* 314 S.W.2d at 776. *See also Metallurgical Industries, Inc. v. Fourtek,* 790 F.2d at 1201–02 (trade secret determination includes assessment under the criterion of value approach as well as other equitable considerations).

(6) In order to prevail on a claim of misappropriation of trade secrets by breach of a confidential relationship, a plaintiff must establish:

> (a) that a trade secret existed;
>
> (b) that the trade secret was acquired through a confidential relationship; and

(c) that the defendant used the trade secret without authorization from the plaintiff.

*Plains Cotton Cooperative Association v. Goodpasture Computer Service, Inc.,* 807 F.2d 1256, 1262 (5th Cir.), *cert. denied,* 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987).

■ (7) To receive legal protection, "the subject matter of a trade secret must be secret." *Luccous v. J.C. Kinley Co.,* 376 S.W.2d 336, 338 (Tex.1964). To constitute a trade secret, the information cannot be generally known by others in the same business nor readily ascertainable by an independent investigation. *Zoecon Industries v. American Stockman Tag Co.,* 713 F.2d 1174, 1179 (5th Cir.1983); *SCM Corp. v. Triplett Co.,* 399 S.W.2d 583, 586 (Tex. Civ.App.—San Antonio 1966, no writ).

■ (8) That Picker requires its service engineers to execute a confidentiality agreement, together with the fact that Picker has expended millions of dollars and devoted man-years of research and development, are probative factors that point to the existence of a trade secret. *See, e.g., Metallurgical Industries, Inc. v. Fourtek,* 790 F.2d at 1199; *K & G Oil, Tool & Service Co. v. G & G Fishing Tool Service,* 158 Tex. 594, 314 S.W.2d 782, 790, *cert. denied,* 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 149 (1958); *J.C. Kinley Co. v. Haynie Wire Line Service, Inc.,* 705 S.W.2d 193, 196 (Tex.App.—Houston [1st Dist.] 1985).

■ (9) It is the Court's finding that the Picker proprietary information at issue herein is clearly valuable in that without the specialized training, documents, and software development, the ability to efficiently diagnose and service Picker MRI systems would be reduced. The fact that ETEK's entry into the business of Picker MRI systems coincided with the hiring of Blanton is particularly probative of this finding, and is further evidence of the existence of a trade secret. *See, e.g., Expo Chemical Co. v. Brooks,* 572 S.W.2d 8, 11 (Tex.Civ.App.—Houston [1st Dist.] 1978), *rev'd on other grounds,* 576 S.W.2d 369 (Tex.1979).

(10) The Court is of the opinion that Plaintiff meets the test for trade secret with respect to the information misappropriated by Blanton pertaining to Picker's MRI systems, including: Picker's MRI block diagrams; Picker's MRI training and service manuals; the training and manuals provided by Picker on the 3M laser imagers used with Picker MRI systems; and Picker's specialized MRI system software. All of the foregoing is information that was developed by Picker and is not generally available in the industry.

■ (11) It is further the finding of the Court that Picker's trade secrets were acquired by Blanton through his confidential relationship with Picker, and that Blanton used the trade secrets without authorization from Picker. Accordingly, the Court concludes that Picker's proprietary information with regard to the servicing of Picker MRI systems is entitled to protection as a trade secret.

■ (12) Injunctive relief is appropriate to prevent the disclosure of confidential information which the employer maintained as a trade secret. *Zoecon Industries v. American Stockman Tag Co.,* 713 F.2d 1174, 1179 (5th Cir.1983); *Hallmark Personnel v. Franks,* 562 S.W.2d 933, 935 (Tex.App.—Houston [1st Dist.] 1978).

■ (13) Injunctive relief is especially appropriate where an employee seeks to disclose or use confidential information acquired through specialized training provided by the former employer. *See, e.g., Unitel Corp. v. Dicker,* 731 S.W.2d 636, 640 (Tex.App.—Houston [14th Dist.] 1987); *Orkin Exterminating Co. v. Wilson,* 501 S.W.2d 408, 411 (Tex.Civ.App.—Tyler 1973).

■ (14) Because the Court has found that Blanton is in possession of over 7,000 pages of confidential Picker information (Fact 45, above), and because Blanton has provided technical information regarding the servicing of Picker MRI systems to ETEK employees (Fact 51, above), the Court is of the opinion that there is substantial likelihood that Picker will prevail

on its claim for misappropriation of trade secrets.

### B. Claim for Breach of Non–Use and Non–Disclosure Provisions

(1) In *Williams v. Compressor Engineering Corp.*, 704 S.W.2d 469 (Tex.App.— Houston [14th Dist.] 1986, writ ref'd n.r.e.), the court noted that:

> Texas courts clearly recognize the right of an employer to insist that the nondisclosure provisions of his contract with an employee be specifically enforced.... Proof that trade secrets will be used by the employee in competition against his former employer afford support for an injunction specifically enforcing the non-competition covenant. This is usually the only way use of the secret by the former employee can be prevented.

*Id.* at 471–72.

■ (2) Injunction is a proper remedy where an employee has breached, or is in such a position that it is likely that he will breach, a confidentiality agreement. *See, e.g., FMC Corp. v. Varco International, Inc.*, 677 F.2d 500 (5th Cir.1982) (injunctive relief proper to enforce the non-disclosure provision of an employment contract where the defendant was newly employed in a position in which it would have difficult to avoid the disclosure or use of his former employer's confidential information); *Weed Eater, Inc. v. Dowling*, 562 S.W.2d 898 (Tex.Civ.App.—Houston [1st Dist.] 1978) (injunctive relief proper to enforce confidentiality agreement because, even assuming the best of good faith on the part of the former employee, he could hardly prevent his knowledge of his former employer's trade secrets from showing up in his nearly identical new position).

■ (3) Inasmuch as the Court has found that Blanton has disclosed and used, and may presently be disclosing and using, Picker's confidential information, and because such use and disclosure is expressly prohibited by the Confidentiality Agreement, the Court is of the opinion that Picker has established a substantial likelihood of success on its claim for breach of the non-disclosure and non-use provisions. Accordingly, preliminary injunctive relief is appropriate.

### C. Claim for Breach of Covenant Not to Compete

(1) The enforceability of covenants not to compete in Texas is governed by Tex. *Bus. & Com.* Code Ann. § 15.50, which provides that a covenant not to compete is enforceable to the extent that it (a) is ancillary to an otherwise enforceable agreement, and (b) contains reasonable limitations as to time, geographical area, and scope of activity to be restrained.[2]

(2) Section 15.50 became effective on 8/28/89 and is retroactive in its application to covenants entered into before that date. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 683–84 (Tex.1990).

(3) *Test:* Closely parallel to § 15.50, recent case law requires that four factors be satisfied in order that an agreement not to compete may be construed as a "reasonable" restraint of trade:

1) the agreement not to compete must be ancillary to an otherwise valid transaction or relationship;

2) the restraint must not be greater than necessary to protect the promisee's legitimate interest;

3) the promisee's need for the protection afforded by the agreement not to compete must not be outweighed by either

---

**2.** Tex. *Bus. & Com.* Code Ann. § 15.50 (Vernon 1990 Supp.) reads in its entirety as follows:

**§ 15.50. Criteria for Enforceability of Covenants not to Compete.**

Notwithstanding Section 15.05 of this code, a covenant not to compete is enforceable to the extent that it:

(1) is ancillary to an otherwise enforceable agreement but, if the covenant not to compete is executed on a date other than the date on which the underlying agreement is executed, such covenant must be supported by independent valuable consideration; and

(2) contains reasonable limitations as to time, geographical area, and scope of activity to be restrained that do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

the hardship to the promisor or any injury likely to the public, and

4) must be supported by valuable consideration.

*DeSantis*, at 681–82, 681 n. 6; *Martin v. Credit Protection Ass'n, Inc.*, 793 S.W.2d 667, 668–69 (Tex.1990).

(4) "Whether an agreement not to compete is a reasonable restraint of trade is a question of law for the court." *Id.* at 682.

(5) *Factor #1: Ancillary to an otherwise valid transaction*

Given that the Court has found hereinabove that the non-disclosure and non-use covenants of the Confidentiality Agreement are themselves valid and enforceable agreements, the Confidentiality Agreement's covenant not to compete is clearly "ancillary to an otherwise enforceable agreement". This factor is therefore satisfied.

(6) *Factor #2: Restraint not greater than necessary*

"The extent of the agreement not to compete must be accordingly be limited appropriately as to time, territory, and type of activity." *DeSantis*, at 682.

The covenant at issue does not prevent Blanton from competing with Picker in the MRI service business, but rather only provides for a one-year period of noncompetition in which Blanton is prohibited from servicing the same sites he serviced for Picker.[3] *Compare French v. Community Broadcasting of Coastal Bend, Inc.*, 766 S.W.2d 330 (Tex.App.—Corpus Christi 1989, writ dism. woj.) (three years held reasonable time); *Diversified Human Resources Group, Inc. v. Levinson–Polakoff*, 752 S.W.2d 8, 11 (Tex.App.—Dallas 1988) (a reasonable geographical restriction "is generally considered to be the territory in which the employee worked while in the employment of his employer.").

The Court is of the opinion that such restrictions herein as set forth above are reasonable and not greater than necessary to protect Picker's legitimate interests.

(7) *Factor #3: Promisee's need for protection not outweighed by hardship to promisor or public*

The covenant at issue does not competition in any significant way. Blanton is free to service any MRI system, including Picker MRI systems, *except* for the *same* machines he serviced while in Picker's employ. Further, the limited time period of one year guarantees that no significant effect on competition will occur. Accordingly, the Court is of the opinion that this element is satisfied.

(8) *Factor #4: Supported by valuable consideration*

"Special training or knowledge acquired by an employee during employment may constitute independent valuable consideration." *Martin*, at 670. *See also Bland v. Henry & Peters, P.C.*, 763 S.W.2d 5, 8 (Tex.App.—Tyler 1988, writ denied) (special training and knowledge is consideration that will support a covenant not to compete ancillary to a contract of employment).

Given the specialized training and knowledge acquired by Blanton during his employ at Picker, the Court is of the opinion that this factor has been met.

Therefore, because the requisites necessary for an enforceable agreement not to compete have been satisfied, the Court is of the opinion that there is a substantial likelihood that Picker will prevail in that cause of action against Blanton predicated upon Blanton's breach of the Confidentiality Agreement's non-competition provision.

III. *Substantial Threat of Irreparable Injury*

■ (1) Where the defendant will be unable to prevent knowledge of plaintiff's trade secrets "from infiltrating his work ... Texas has recognized the need for injunctive relief." *FMC Corp. v. Varco International, Inc.*, 677 F.2d 500, 504 (5th Cir.1982). "[I]t is not the number of trade secrets taken that determines whether the threat of irreparable harm exists. The fact

**3.** The Texas Legislature, via Tex. *Bus. & Com.* Code Ann. §§ 15.50–15.51 (Vernon Supp.1990), "has now rejected common calling as a test for the reasonableness of noncompetition agreements." *DeSantis*, at 683.

that a single trade secret may be disclosed is enough." *Id.* at 503. Furthermore, an injunction "is usually the only way use of the [trade] secret by the former employee can be prevented." *Williams v. Compressor Engineering Corp.,* 704 S.W.2d 469, 472 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.).

(2) Here, the Court would note that it is uncontroverted that Blanton is presently working for a direct competitor of Picker, and that "where the uncontradicted evidence shows that a former employee is working for a direct competitor, no finding of irreparable injury is necessary to support a permanent injunction to protect trade secrets." *Williams v. Compressor Engineering Corp.,* 704 S.W.2d at 470.

(3) The Court concludes that as a matter of law there is a substantial threat of irreparable injury to Picker if the preliminary injunction is not issued.

### IV. *Threatened Injury to Plaintiff Outweighs Damage to Defendant*

██ (1) When balancing the threat of injury to the plaintiff if no preliminary injunction were to issue, versus the risk of injury to the defendant that would be caused by such an issuance, the proper result is to protect the plaintiff's legal right. As stated by the Texas Supreme Court:

> [W]hen ... a choice must be made between the possible punitive operation of the writ and the failure to provide adequate protection of a recognized legal right, the latter course seems indicated and the undoubted tendency of the law has been to recognize and enforce higher standards of commercial morality in the business world.

*Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 773 (1958).

██ (2) The Court finds that the competitive benefits obtained by Picker at a cost of millions of dollars and man-years of research may vanish or be endangered if Blanton is permitted to have continued free use of Picker's trade secrets. The risk of harm to Blanton, however, is slight, because of the reasonable restrictions in time, scope, and geographic region sought by Picker.

(3) The Court finds that under the facts of this case and as a matter of law, the risk of irreparable injury to Picker outweighs the risk of injury to Blanton that would be caused by the issuance of a preliminary injunction.

### V. *Injunction Will Not Disserve Public Interest*

██ (1) The public interest is served by protecting trade secrets. In *Metallurgical Industries, Inc. v. Fourtek,* 790 F.2d 1195, 1201 (5th Cir.1986), the court stated as much when it wrote:

> That the cost of devising the secret and the value of the secret provides are criteria in the legal formulation of a trade secret shows the equitable underpinnings of this area of the law. It seems only fair that one should be able to keep and enjoy the fruits of his labor. If a businessman has worked hard, has used his imagination, and has taken bold steps to gain an advantage over his competitors, he should be able to profit from his efforts. Because a commercial advantage can vanish once the competition learns of it, the law should protect the businessman's efforts to keep his achievements secret.

(2) The Court is of the opinion that under the facts of this case and as a matter of law, the public interest would not be disserved by the entry of a preliminary injunction as ordered hereinbelow.

### VI. *Conclusion*

Having satisfied all of the prerequisites to the issuance of injunctive relief, the Court finds that the Plaintiff is entitled, until further order of the Court and pending further hearing of this cause, to a

984

preliminary injunction forthwith against the Defendant as set forth hereinbelow so that Plaintiff's rights may be preserved and in order to prevent irreparable injury to Plaintiff pending final judgment herein. Accordingly,

IT IS ORDERED, ADJUDGED AND DECREED that, for a period of one (1) year from the date of this Order or until further order of this Court:

(1) Defendant is ENJOINED from further violating the non-competition provisions of his Employment Agreement by servicing, directly or indirectly, the specific equipment serviced by him while employed by Picker.

(2) Defendant is ENJOINED from further disclosing or using, or causing others to use or disclose, the confidential and proprietary information of Picker acquired by Blanton during his employment with Picker, by using such information in servicing Picker MRI systems or by instructing others in, or disclosing to others, the techniques and procedures in servicing Picker MRI systems.

(3) Defendant is ENJOINED from retaining any of those materials, or copies thereof, which he was required to return to Picker upon the termination of his employment with Picker, and any and all copies of any Picker MRI block diagram, Picker Service Engineer Administration Guide, or Picker 3M laser imager training materials, and is ORDERED to return the same to Picker forthwith.

SO ORDERED.